# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### AIKEN DIVISION

| | | |
|---|---|---|
| Shawn Phillip Rhoades, | ) | Civil Action No.: 1:21-cv-03391-JMC |
| Joseph Franklin Dennis, | ) | |
| Joshua Marshall Floyd, | ) | |
| Bruce Allan Hickman, | ) | **FINDINGS OF FACT, CONCLUSIONS** |
| Stephen James Snyder, | ) | **OF LAW, AND ORDER AND OPINION** |
| Michael Howard Derrick, | ) | **DENYING PLAINTIFFS' MOTION** |
| Emily Roberson Skelley, | ) | **FOR PRELIMINARY INJUNCTION** |
| Charles Gregory Springs, | ) | |
| John N. Vinson, | ) | |
| Jason Duane Hicks, | ) | |
| Courie Jonathan Dennis, | ) | |
| Kimberly Marie Vietmeier, | ) | |
| Martha LeAnne Boettjer-Eyster, | ) | |
| Jimmy Dale Furtick, | ) | |
| Mary Williams Hall, | ) | |
| Donna Brinson Stalcup, | ) | |
| Michael Wiley Moulton, Jr., | ) | |
| Laurie Aldrich Wood, | ) | |
| Jeffrey John Grinnell, | ) | |
| Vickie Lee Head, | ) | |
| Victoria B Sininger, | ) | |
| Chester Craig Gosney, | ) | |
| Glenn Adam DeFrees, | ) | |
| Penelope Rogers Fell, | ) | |
| Thomas John Diaz, | ) | |
| Stephen Judson Hall, | ) | |
| Cynthia Powell Burke, | ) | |
| Lori A. Roberts, | ) | |
| Bryce Allen Roberts, | ) | |
| Aubrie Jackson Norris Jr., | ) | |
| Jeffrey Alan Klapper, | ) | |
| Vanessa F. Rewis, | ) | |
| Kerek Monroe Bearden, | ) | |
| Timothy Levi Parker, | ) | |
| George Ren Fell, | ) | |
| Ross Roberson, | ) | |
| Betty Jo Still, | ) | |
| Richard Henry Turlington, | ) | |
| Brittany Holsonback Parker, | ) | |
| Michael Matthew Volpe, | ) | |
| Franklin Wallace Odom, | ) | |
| Stephanie Dianne Williams, | ) | |

Richard Douglas Posey,                                    )
Joseph Williams Gentry Jr.,                              )
Charisse Osborne Nagy,                                    )
Joseph Mark Redd,                                         )
Joshua Dane Gross,                                        )
Dawn Michelle Cullen,                                     )
Harry Charles Corey,                                      )
John Louis Wilson,                                        )
Bryan Reid Scott Jr,                                      )
Hailey Alexis Hickman,                                   )
Emmett Daniel Ferrell Jr.,                               )
Roy Phillip Brock Jr.,                                    )
Christopher Daniel Herndon,                              )
Catherine Carter Lynn,                                   )
Hayley Marie Williams,                                   )
Jana Darnell Schroeder,                                  )
Thomas Luther Googe,                                      )
Clarence A Palmer,                                        )
James Arnold Jones,                                       )
Edward Lindsey Boozer Jr.,                               )
Linda G Sparks,                                           )
Ryan Alan Mann,                                           )
Lawrence Elmer Jeffers, III,                             )
Richard Carlisle Holley,                                 )
Tina Marie Wingfield,                                     )
Christopher Samuel Bruce,                                )
John Mark LeMaster,                                       )
Ginger Humphries-Hasek,                                  )
Christina Cheree Fassari,                                )
Jason Marella,                                            )
Michael Ray Andis,                                        )
Jimmie Phillip Harmon,                                   )
Jacob Benjamin Anderson,                                 )
Benjamin James Wrett Thompson,                           )
Daniel Ryan Daniel,                                       )
Dennis Paul Villemain,                                    )
Emmalee Wall,                                             )
James Mitchell Whittington,                              )
Jessica Steedley,                                         )
Joel Lloyd Shaffer,                                       )
Jonathan Brent Cole,                                      )
Michael Bryan Roeber,                                     )
Richard Perry Brown,                                      )
Robert William Kirkland,                                  )
Ryan Knight Wagner,                                       )
Steven Mark Lawson,                                       )

Teresa Arnwine,                                 )
Tracy Eugene Stover Jr., and                    )
Troy Daren McClendon,                           )
                                                )
                    Plaintiffs,                 )
                                                )
v.                                              )
                                                )
Savannah River Nuclear Solutions, LLC,          )
                                                )
                    Defendant.                  )

This matter is before the court on Plaintiffs' Motion for Preliminary Injunction and Restraining Order. (ECF No. 14.) Plaintiffs ask the court to block implementation of Defendant Savannah River Nuclear Solutions, LLC's ("SRNS") vaccine mandate (the "Mandate") for its employees. (*Id.* at 1.) For the reasons set forth below, the court **DENIES** Plaintiffs' Motion for Preliminary Injunction and Restraining Order.[1] (ECF No. 14.)

## I.    JURISDICTION

1.    This court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interests and costs.

2.    Plaintiffs are citizens and residents of either Georgia or South Carolina. (ECF No.

---

[1] The court notes that, although Plaintiffs style their Motion as one for preliminary injunction and retraining order, the Motion appears to combine these into one request for a preliminary injunction to block, enjoin, and prohibit SRNS from enforcing its vaccination mandate. (*See* ECF No. 14 at 3–4.) Rule 52 of the Federal Rules of Civil Procedure requires the court to "state the findings and conclusions that support" the "granting or refusing [of] an interlocutory injunction." Fed. R. Civ. P. 52(a)(2). In further adherence to Rule 52(a)(1), this Order "finds [] facts specially and state[s] its conclusions of law separately" in numbered paragraphs. The court observes that Rule 52 does not require a discussion of every issue argued and/or presented. *E.g.*, *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) ("But Rule 52(a) exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness. It simply require[s] findings that are explicit and detailed enough to enable us to review them under the applicable standard." (internal and external citations and quotation marks omitted)).

2-1 at 5–15 ¶¶ 1–79.)  SRNS is a limited liability company and, as such, its citizenship is determined by the citizenship of all of its members.  *Central W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011).  Further, a corporation [] "shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."  (*Id.* (citing 28 U.S.C. § 1332(c)(1)) (internal quotations omitted).  SRNS states that its members are Fluor Federal Services, Inc.; Honeywell International, Inc.; and Newport News Nuclear, Inc.  (ECF No. 2 at 4 ¶ 6.)  SRNS alleges that Fluor Federal Services, Inc. is incorporated in Washington state and has its principal place of business in Virginia; Honeywell International, Inc. is incorporated in Delaware and has its principal place of business in North Carolina; and Newport News Nuclear, Inc. is incorporated and has its principal place of business in Virginia.  (*Id.* ¶ 7.)  Accordingly, complete diversity exists between the parties.

3.      Moreover, after considering the Complaint's allegations, the court is satisfied that the amount in controversy requirement is met.  "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977).  In the United States Court of Appeals for the Fourth Circuit, "the test for determining the amount in controversy in a diversity proceeding 'is the pecuniary result to either party which [a] judgment would produce.'"  *Dixon v. Edwards*, 290 F.3d 699, 711 (4th Cir. 2002) (citing *Gov't Emps. Inc. Co. v. Lally*, 327 F.2d 568, 569 (4th Cir. 1964)).  The object of the present litigation is SRNS's vaccine mandate, and the value of the Mandate is measured by the potential losses that follow its enforcement.  Plaintiffs allege that if the Mandate is enforced, they stand to lose their livelihood, their salaries, and in some cases their health benefits if they do not take the vaccine.  (ECF No. 9

at 41 ¶ 230.)  The collective salaries and benefits of the seventy-nine (79) Plaintiffs well exceed $75,000.00.

## II.     RELEVANT BACKGROUND

### A.     <u>COVID-19 Pandemic</u>

1.      In December 2019 and January 2020, COVID-19 began to spread in the United States on its way to pandemic proportions.  (ECF No. 26 at 17.)  In South Carolina alone, there have been approximately 919,127 COVID-19 cases and 14,233 deaths due to COVID-19.  *COVID Data Tracker*, CDC, https://covid.cdc.gov/covid-data-tracker/#cases_totalcases & https://covid. cdc.gov/covid-data-tracker/#cases_totaldeaths (last visited Dec. 3, 2021).[2]

2.      COVID-19 is an infectious disease caused by the novel coronavirus.  COVID-19 is spread in three main ways: breathing in air when close to an infected person who is exhaling small droplets and particles that contain the virus; having these small droplets and particles that contain virus land on the eyes, nose, or mouth, especially through splashes and sprays like a cough or sneeze; and touching eyes, nose, or mouth with hands that have the virus on them.  *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads .html (last visited Nov. 23, 2021).

3.      In February 2020, the United States Department of Health and Human Services ("HHS") declared a public emergency and instructed the Food and Drug Administration ("FDA") to grant emergency use authorizations ("EUA") for medical devices and interventions, including vaccines, to combat the COVID-19 pandemic.  *See* 85 Fed. Reg. 7316-01, 7316-17 (2020); 85 Fed.

---

[2] The court observes that for purposes of document formatting, the links to internet websites cited throughout the Order may have space(s) in the website URL where there should not be space(s). To this point, if the link is copied and pasted in a website browser, an error may result from the space in the website URL.

Reg. 18250-01, 18250-51 (2020).

4.      On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. *See WHO Director-General's Opening Remarks at the Media Briefing on COVID-19*, World Health Organization, https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited Dec. 3, 2021).

5.      On March 13, 2020, President Trump pronounced "the ongoing Coronavirus Disease 2019 (COVID-19) pandemic is of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia, pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207." *FEMA COVID-19 Emergency Declaration*, https://www.fema.gov/news-release/2020/03/13/covid-19-emergency-declaration (last visited Dec. 3, 2021). The President further declared the pandemic a national emergency. *See Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic*, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/24/notice-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic/ (last visited Dec. 3, 2021).

6.      On December 18, 2020, the FDA issued an EUA for the Moderna COVID-19 Vaccine for the prevention of COVID-19 in individuals 18 years of age and older.[3]

7.      On February 27, 2021, the FDA issued an EUA for the Janssen COVID-19 Vaccine

---

[3] *See Moderna COVID-19 Vaccine*, U.S. Food & Drug Administration, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/moderna-covid-19-vaccine (last visited Nov. 24, 2021).

for COVID-19 in individuals 18 years of age and older.[4]

8.      On August 23, 2021, the FDA announced the first approval of a COVID-19 vaccine, previously known as the Pfizer-BioNTech COVID-19 Vaccine, and now marketed as Comirnaty, for the prevention of COVID-19 in individuals 16 years of age and older.[5]

9.      On September 9, 2021, President Biden issued Executive Order No. 14042, entitled "Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors." *Executive Order No. 14042* (Sept. 9, 2021).   Executive Order No. 14042 requires federal contractors to comply with requirements established by the Safer Federal Workforce Task Force, including.  (*Id.*)  The Safer Federal Workforce Task Force Guidance for Federal Contractors and Subcontractors ("Guidance") requires "covered contractors" to "ensure that all covered contractor employees are fully vaccinated for COVID-19, unless the employee is legally entitled to an accommodation" by January 18, 2022.  *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* 5, Safer Federal Workforce Task Force Guidance, https://www. saferfederalworkforce.gov/downloads/Guidance%20for%20Federal%20Contractors_Safer%20F ederal%20Workforce%20Task%20Force_20211110.pdf (updated Nov. 10, 2021). The Guidance further provides that:

> A covered contractor may be required to provide an accommodation to covered contractor employees who communicate to the covered contractor that they are not vaccinated against COVID-19 because of a disability (which would include

---

[4]      *See  Janssen  COVID-19  Vaccine*,  U.S.  Food  &  Drug  Administration, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/ janssen-covid-19-vaccine (last visited Nov. 24, 2021).

[5]  *See Comirnaty and Pfizer-BioNTech COVID-19 Vaccine*, U.S. Food & Drug Administration, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/comirnaty-and-pfizer-biontech-covid-19-vaccine (last visited Nov. 24, 2021); *see also Interim Clinical Considerations*, CDC, https://www.cdc.gov/vaccines/covid-19/clinical-consider ations/ covid-19-vaccines-us.html#foot-01 (last visited Nov. 24, 2021) ("The Pfizer-BioNTech 30 µg formulation (purple cap) is FDA-approved for use in persons aged ≥16 years and FDA-authorized for use in persons aged ≥12 years.").

medical conditions) or because of a sincerely held religious belief, practice, or observance. A covered contractor should review and consider what, if any, accommodation it must offer. Requests for "medical accommodation" or "medical exceptions" should be treated as requests for a disability accommodation.

(*Id.*) For purposes of the Guidance, individuals "are considered fully vaccinated if they have received COVID-19 vaccines currently approved or authorized for emergency use by the U.S. Food and Drug Administration (Pfizer-BioNTech, Moderna, and Johnson & Johnson [J&J]/Janssen COVID-19 vaccines) or COVID-19 vaccines that have been listed for emergency use by the World Health Organization (*e.g.*, AstraZeneca/Oxford)." (*Id.* at 4.)

**B.    The Present Litigation**

10.    On October 14, 2021, Plaintiffs filed this action in the Court of Common Pleas for Aiken County, requesting declaratory judgment, a temporary restraining order, a preliminary injunction, and a permanent injunction to block SRNS's vaccine mandate.[6]  (ECF No. 2-1.)

11.    On October 15, 2021, SRNS removed the case to federal court based on diversity. (ECF No. 2.)

12.    On November 4, 2021, Plaintiffs filed their First Amended Complaint (ECF No. 9), seeking a declaratory judgment that the Mandate violates South Carolina law, South Carolina public policy, as well as federal law and federal public policy and "should be stricken and declared unenforceable." (ECF No. 9 at 3–4.)  Specifically, Plaintiffs allege the Mandate constitutes the illegal practice of medicine in violation of South Carolina Code § 40-47-30 (West 2021). (ECF No. 9 at 40 ¶¶ 222–23.)  Plaintiffs further contend that the Mandate violates the public policy of South Carolina, "which generally not only opposes COVID-19 vaccination employer mandates

---

[6] Plaintiffs did not move for injunctive relief in either the initial Complaint (ECF No. 2-1) or the First Amended Complaint (ECF No. 11).  Plaintiffs filed their Motion for Preliminary Injunction and Restraining Order on November 19, 2021.  (ECF No. 14.)

but also, as a general rule, always gives South Carolinians a choice in refusing to take a [v]accine without being punished as a result of that medical choice." (*Id.* at 41 ¶ 229.)

13.    Plaintiffs contend that, without injunctive relief, they will be irreparably harmed by losing their livelihood, their salaries, and in some cases their health benefits if they do not take the vaccine, or "physical danger, harm, and possibility of death" if they are pressured into taking the vaccine. (*Id.* at 41 ¶ 230, 44 ¶ 246.)

14.    Plaintiffs also allege SRNS violates certain safeguards of the Federal Food, Drug, and Cosmetic Act ("FDCA") found at 21 U.S.C. § 360bbb-3(e)(1)(A)(II)(III), illustrating it has violated federal public policy. (ECF No. 9 at 4.)

15.    On November 11, 2021, SRNS filed a Motion to Dismiss the First Amended Complaint. (ECF No. 11.)

16.    On November 19, 2021, Plaintiffs filed their Motion for Preliminary Injunction and Restraining Order to Block Implementation of Private Employer Vaccine Mandate and Incorporated Memorandum in Support. (ECF No. 14.)

17.    On November 30, 2021, the court held a hearing on the Motion to Dismiss (ECF No. 11), Motion to Amend the Amended Complaint (ECF No. 13), and the Motion for Preliminary Injunction and Restraining Order (ECF No. 14). [7]    At the November 30, 2021 Motions Hearing (the "Motions Hearing"), the court granted Plaintiffs' Motion to Amend the Amended Complaint

---

[7] On November 19, 2021, Plaintiffs filed their Motion for Preliminary Injunction and Restraining Order. (ECF No. 14.) On November 29, 2021, after SRNS filed its Response in Opposition (ECF No. 20) and the afternoon before the preliminary injunction hearing, Plaintiffs filed several affidavits purporting to support their earlier filed motion. At the hearing, SRNS objected to the affidavits based on their untimely filing and hearsay. Due to the untimely filing of the affidavits and the fact that two (2) of the affidavits contain hearsay from non-parties, the court declines to consider them. FED. R. CIV. P. 6(c)(2).

(*see* ECF Nos. 22, 24) and informed the parties that the Second Amended Complaint (ECF No. 26) would be the operative complaint for future motions.

18.     This order addresses Plaintiffs' Motion for Preliminary Injunction and Restraining Order. (ECF No. 14.)

### III.     FINDINGS OF FACT[8]

#### A.     <u>The Parties</u>

1.     Plaintiffs are employees or contractors of SRNS.  (ECF No. 26 at 3.)

2.     SRNS manages and operates the Savannah River Site pursuant to a management and operations contract with the U.S. Department of Energy ("DOE"), the owner of the site. *Frequently Asked Questions*, Savannah River Nuclear Solutions, https://www.savannahrivernu clearsolutions.com/faq01.htm (last visited Dec. 3, 2021).  SRNS is a private company and a Limited Liability Company LLC owned by Fluor, Newport News Nuclear, and Honeywell. *Projects*, Fluor, https://www.fluor.com/projects/savannah-river-nuclear-management-operations (last visited Dec. 3, 2021).

#### B.     <u>The Vaccine Mandate</u>

3.     In March 2020, SRNS put together a team to monitor COVID-19 information and track data and trends across its sites.  In July 2021, cases of COVID-19 and COVID-19 related deaths across SRNS sites increased due to the Delta variant of COVID-19.  (ECF No. 20 at 9 n.3.)

4.     In September 2021, SRNS issued the Mandate requiring all SRNS employees to be fully vaccinated against COVID-19 with the Pfizer-BioNTech, Moderna, or the Johnson &

---

[8] To the extent any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted.  Moreover, as this is a preliminary injunction, any facts identified "are not final determinations of disputed matters." *EZ Gard Indus., Inc. v. XO Athletic Co.*, No. 07-CV-4769 (JMR/FLN), 2008 WL 1827490, at *1 n.1 (D. Minn. Apr. 23, 2008).

Johnson vaccine by November 30, 2021.  (ECF Nos. 26 at 41 ¶ 222, 26-4 at 1.)  The Mandate was effective immediately and issued by SRNS in its capacity as a private employer operating under a federal contract for the purpose of "stop[ping] the spread of the virus by having as many employees vaccinated absent legally recognized exceptions."  (ECF No. 20 at 4.)

5.      Pursuant to the Mandate, employees must receive their first vaccine shot on or before October 15, 2021, and be fully vaccinated by November 30, 2021, unless exempted.  (ECF No. 26-4 at 1.)  The Mandate provides that "[t]he Pfizer vaccine is available on site. Johnson & Johnson and Moderna vaccines are not currently offered on site but are accepted as vaccinations approved by the CDC."  (*Id.* at 2.)

6.      SRNS made available a Vaccine Information Fact Sheet For Recipients And Caregivers About Comirnaty (Covid-19 Vaccine, mRNA) And The Pfizer-Biontech COVID-19 Vaccine To Prevent Coronavirus Disease 2019 (COVID-19) For Use In Individuals 12 Years of Age And Older (ECF No. 26-1), a Fact Sheet For Recipients And Caregivers For Emergency Use Authorization (EUA) of The Moderna COVID-19 Vaccine to Prevent Coronovarius Disease 2019 (COVID-19) In Individuals 18 Years Of Age And Older (ECF No. 26-2), and a Fact Sheet For Recipients And Caregivers Of The Emergency Use Authorization (EUA) Of The Janssen COVID-19 Vaccine To Prevent Coronavirus Disease 2019 (COVID-19) In Individuals 18 Years Of Age And Older (ECF No. 26-3).  These Fact Sheets contain information regarding the risks and benefits of receiving the Janssen COVID-19 Vaccine.  (*Id.*)

7.      Employees may be vaccinated on site at SRNS, with a personal physician, or at a community vaccination site.  (ECF No. 26-3)

8.      Vaccination is a condition of employment.  (ECF No. 26-34 at 2.)

9.     The Mandate states that employees may request exemptions from the vaccine requirement "to accommodate those who have medical and/or religious reasons for not being vaccinated." (*Id.*)  The Mandate requires medical exemptions to be "supported by a certified form from a personal physician" and explains that "[r]eligious exemptions may require an interview, and certified statement from the individual, and/or potentially supporting documentation from religious leaders or others." (*Id.*)  The exemption committee will consider whether the employee has "a disability protected under the Americans with Disabilities Act or applicable state law" or "a sincerely held religious belief or practice protected under Title VII or applicable state law," "whether the employee can perform the essential functions of the job with reasonable accommodation," and "whether the employee has participated in the process in good faith and has cooperated with SRNS's requests for verification/documentation." (*Id.* at 2.)

10.     Pursuant to the Mandate, employees who choose not to be vaccinated and whose exemptions requests are denied have the option of remaining unvaccinated and taking unpaid leave while remaining employees of SRNS, remaining unvaccinated and resigning, remaining unvaccinated and being subject to termination, or retiring. (*Id.* at 2–3.)

11.     On September 9, 2021, SRNS provided a memorandum to SRNS employees outlining COVID-19 Vaccination Medical and Religious Exemption Guidance. (ECF No. 27-1)

12.     The process for obtaining a Medical Exemption requires that the employee obtain the Medical Exemption form on the SRNS Human Resources home page, submit the form to their personal physician for completion and certification, provide the form to SRNS for review and approval by the Site Medical Team based on the information provided by the employee's personal physician. (*Id.*; ECF No. 26-4.)  The deadline for employees to submit the form was October 1, 2021.

## IV.    CONCLUSIONS OF LAW

### A.    Standing

1.    Although standing has not been challenged in this case, "[i]t is well established that standing is a threshold jurisdictional issue that must be determined first because '[w]ithout jurisdiction the court cannot proceed at all in any cause.'" *Covenant Media of N.C., LLC v. City of Monroe, N.C.*, 285 F. App'x 30, 34 (4th Cir. 2008) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).

2.    "To establish Article III standing, an injury must be 'concrete, particularized and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).  To be particularized, an injury "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)).  "There must be some connection between the plaintiff and the defendant that '[ ]differentiate[s]' the plaintiff so that his injury is not 'common to all members of the public.'" *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019) (quoting *United States v. Richardson*, 418 U.S. 166, 177 (1974)).  "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance," as long as "each individual suffers a particularized harm." *Spokeo, Inc.*, 136 S. Ct. at 1548 n.7.

3.    Moreover, in cases with multiple plaintiffs, "[a]t least one plaintiff must have standing for each claim and form of requested relief." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018).  So long as one Plaintiff "'has demonstrated standing to assert these rights as his own,' the court 'need not consider whether the other individual and corporate plaintiffs have standing to

maintain the suit.'" *Democracy N.C v. N.C. State Bd. Of Elections*, 476 F. Supp. 3d 158,  181 (M.D.N.C. 2020) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977)); *see Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (noting "that a case is justiciable if some, but not necessarily all, of the plaintiffs have standing as to a particular defendant") (citation omitted); *cf. United States v. Students Challenging Reg. Agency Proc. (SCRAP)*, 412 U.S. 669, 690 n.14 (1973) (noting an alleged injury need not be substantial because an "identifiable trifle is enough for standing").

4.      Plaintiffs have alleged that at least two (2) Plaintiffs have been terminated as a result of the SRNS vaccine mandate and the remaining Plaintiffs will be forced to choose between the vaccine and their employment in the immediate future.  (ECF Nos. 26 at 41 ¶ 244, 14 at 4.) The court finds Plaintiffs' alleged injuries are sufficiently concrete and particularized to constitute injury in fact at this stage.  *See Lujan*, 504 U.S. 555, 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (citing *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)) (internal quotations omitted). Further, Plaintiffs sufficiently allege that such injuries are "fairly traceable" to the SRNS's vaccine requirement.  Finally, because Plaintiffs are directly impacted by the Mandate, a judgment preventing the action would certainly redress the harm alleged.  *See id.* at 561–62 ("standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue").

5.      Accordingly, the court finds that Plaintiffs' allegations are sufficient to establish standing at this stage.

B.    **Declaratory Judgment**

6.    The Federal Declaratory Judgment Act ("FDJA") provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

7.    SRNS contends that the court "should exercise its discretion and decline issuing a declaratory judgment under the FDJA because no Plaintiff has alleged they have been terminated as a result of SRNS's vaccination policy" and, therefore, any judgment by the court would be an advisory opinion regarding whether an employer can terminate an at-will employee for noncompliance with a workplace policy. (ECF No. 11 at 5–6.)

8.    The court notes that Plaintiffs' Second Amended Complaint (ECF No. 26) asserts that at least two (2) employees have already been terminated pursuant to the Mandate. (*Id.* at 41–42 ¶¶ 224–225.)    Thus, the possibility of termination based upon Plaintiffs' compliance with the Mandate is not hypothetical. Further, the harm alleged by Plaintiffs is the forced choice between their employment and taking a vaccine they believe is unsafe.  The Mandate requires employees to have made this choice by—at the latest—November 30, 2021.  Neither of these injuries are hypothetical at this juncture, therefore an opinion on this matter would not be advisory.

9.    The South Carolina Declaratory Judgment Act ("SCDJA"), South Carolina Code §§ 15-53-10 *et seq.* (West 2021), authorizes "[c]ourts of record within their respective jurisdictions . . . to declare rights, status and other legal relations whether or not further relief is or could be claimed." S.C. Code Ann. § 15-53-20.  Further, under the SCDJA, an interested person "under a deed, will, written contract or other writings constituting a contract or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise may have

15

determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder." S.C. Code Ann. § 15-53-30.

10.    Here, Plaintiffs seek declarations regarding the legality of the Mandate and their rights in relation to "the contractual terms proposed under the [M]andate." (ECF No. 14 at 29 ¶ 121, 31 ¶ 129.) Because Plaintiffs have pleaded that the Mandate is a contract, they are entitled to seek declaratory relief under section 15-53-30. *HHHunt Corp. v. Town of Lexington*, 699 S.E.2d 699, 707 (S.C. Ct. App. 2010).

## C.    Preliminary Injunction

11.    The court's authority to issue preliminary injunctions arises from Rule 65 of the Federal Rules of Civil Procedure, but "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 840 F. Supp. 2d 898, 914 (D.S.C. 2011), *modified in part*, 906 F. Supp. 2d 463 (D.S.C. 2012), *aff'd*, 720 F.3d 518 (4th Cir. 2013) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

12.    To obtain a preliminary injunction, Plaintiffs must establish all four of the following elements: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.*; *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

13.    The *Winter-Real Truth* standard requires the district court to find that the party seeking the injunction has made a "clear showing" that it is likely to succeed on the merits. *Real*

*Truth,* 575 F.3d at 345; *see also Winter,* 555 U.S. at 22; *Occupy Columbia v. Haley*, 866 F. Supp. 2d 545, 552 (D.S.C. 2011). This standard compels the moving party to show that it is *likely* to prevail. Regardless of the balance of hardships, it is insufficient for the party to show only that "grave or serious questions are presented" in the litigation. *Real Truth,* 575 F.3d at 346; *see also Occupy Columbia*, 866 F. Supp. 2d at 552. However, a finding of a likelihood of success on the merits is not "tantamount to [a] decision[] on the underlying merits," and courts should not "improperly equate[] 'likelihood of success' with 'success.'" *Univ. of Tex. v. Camenisch*, 451 U.S. at 394; *see also, e.g., SCE&G Co. v. Randall*, 333 F. Supp. 3d 552, 564 (D.S.C. 2018).

14. Second, the moving party must make a clear showing that it is likely to be irreparably harmed if preliminary relief is denied. The harm to be prevented must be of an immediate nature and not simply a remote possibility. *Am. Whitewater v. Tidwell*, No. 8:09-cv-02665-JMC, 2010 WL 5019879, at *11 (D.S.C. Dec. 2, 2010) (citing *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). When analyzing the irreparable harm element, the court must make two inquiries: 1) whether the plaintiff is indeed suffering actual and imminent harm; and 2) whether that harm is truly irreparable, or whether it can be remedied at a later time with money damages." *Sauer-Danfoss Co. v. Nianzhu Luo*, No. 8:12-3435-HMH, 2012 WL 6042831, at *1 (D.S.C. Dec. 5, 2012) (quoting *First Quality Tissue SE, LLC v. Metso Paper USA, Inc.*, No. 8:11-2457-TMC, 2011 WL 6122639, at *2 (D.S.C. Dec. 9, 2011)). More specifically, "[a] preliminary injunction is not normally available where the harm at issue can be remedied by money damages." *Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011). [9]

---

[9] The presumption against issuing preliminary injunctions where a harm suffered can be remedied by money damages at judgment stems from real concerns the issuance of a preliminary injunction remedy raises. These concerns include, for example, the fact that in issuing a preliminary

15.     Third, the moving party must show that the balance of equities tips in its favor.  *Id.*; *see also Uhlig, LLC v. Shirley*, No. 6:08-cv-01208-JMC, 2012 WL 2458062, at *4 (D.S.C. June 27, 2012).

16.     Fourth, the district court must consider whether the grant or denial of the injunction is in the public interest.  The court must give "particular regard" to the public consequences of granting a preliminary injunction.  *Real Truth*, 575 F.3d at 347.

17.     The Fourth Circuit no longer recognizes a "flexible interplay among the four criteria for a preliminary injunction."  *Real Truth*, 575 F.3d at 347.  Instead, each of these requirements "must be fulfilled as articulated."  *De la Fuente v. S.C. Dem. Party,* CA No. 3:16-cv-00322-CMC, 2016 WL 741317, at *2 (D.S.C. Feb. 25, 2016).  A plaintiff must first prove the first two elements before a court considers whether the balance of the equities tips in his favor. *See Real Truth*, 575 F.3d at 346–47.  Additionally, the court pays particular attention to the public consequences of employing this extraordinary form of relief via injunction.  *Id.* at 347 (citing *Winter*, 555 U.S. at 24).

18.     A prayer for declaratory relief must accompany a valid cause of action.  *Canipe v. Canipe*, No. 89-1506, 1990 WL 180118, at *2 (4th Cir. 1990) ("[T]here must be an independent basis for jurisdiction before declaratory relief may be sought under the Declaratory Judgment Act."); *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 323–24 (4th Cir. 1937) ("[D]eclaratory judgment is a remedy, much like an injunction, that a court may decline to order.").  Therefore,

---

injunction order, a district court is required, based on an incomplete record, to order a party to act in a certain way.  *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).  Issuing an injunction further risks repetitive litigation, that which carries significant costs for both parties.  *Id.*  Thus, there are only "extraordinary circumstances" that are "quite narrow" in application, where preliminary injunction is appropriate notwithstanding monetary damages.  *Id.* (discussing a plaintiff's business not being able to survive as an example of such circumstances).

the court will look to the causes of action underlying Plaintiffs' requests for declaratory judgment in turn.

19.    Further, while a district court may issue a preliminary injunction without the presentation of evidence, it can only do so when the facts at issue are not disputed. *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 683 (N.D. Tex. 2015); *see also Paisley Park Enter., Inc. v. Boxill*, 253 F. Supp. 3d 1037, 1049 (D. Minn. 2017) ("A preliminary injunction 'may issue to protect plaintiff's remedy' when 'the plaintiff has demonstrated sufficient evidence to support the claim that it will be unable to recover absent a preliminary injunction.'") (citing *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987)).

## V.    ANALYSIS

### A.    <u>Likelihood of Success of the Merits</u>

#### a.    *Unauthorized Practice of Medicine*

1.    Plaintiffs allege SRNS's Mandate constitutes the unlawful practice of medicine under South Carolina law, which provides that a person must be twenty-one (21) years old and duly licensed to practice medicine in the state of South Carolina. S.C. Code Ann. § 40-47-30(A) (West 2021).

2.    Plaintiffs cite to the statutory provisions defining the practice of medicine as "rendering a determination of medical necessity or a decision affecting the diagnosis and/or treatment of a patient" and as "offering or undertaking to prescribe, order, give, or administer any drug or medicine for the use of any other person." S.C. Code Ann. § 40-47-20(36)(b), (f) (West 2021). Plaintiffs contend Defendant is engaging in the practice of medicine through the language of the Mandate requiring vaccinations, by denying requests for medical exemptions, and by administering or offering the vaccines onsite. (*See* ECF No. 26 at 43–44 ¶¶ 230–36)

3.    First, the court is not persuaded that requiring employees to be vaccinated constitutes the "rendering of a decision of medical necessity" or otherwise "affecting the diagnosis or treatment of a patient."  While the South Carolina Code of laws does not define the phrase "medical necessity," this phrase generally refers to:

> providing health care services or products that a prudent physician would give a person for the purpose of diagnosing, or treating, an illness, injury, disease or its symptoms, in a way that is customarily recognized as appropriate medical practice, consistent with symptoms or treatment of the condition, not solely for anyone's convenience, and not chiefly for the education of the provider or patient.

*Medical Necessity*, 50 State Statutory Surveys: Health Care: Health Insurance Oversight, 0100 SURVEYS 29 (Reuters Sept. 2020).  The Mandate does not appear to "provide healthcare services" for the purpose of diagnosis (meaning the "identification of the nature of an illness or other problem by examination of the symptoms")[10] or treatment (meaning "[m]edical care given to a patient for an illness or injury")[11].

4.    SRNS contends that the Mandate is a workplace safety requirement, meaning that an employee must be vaccinated to work safely at SRNS, not that vaccines are required for medical treatment.  Employers are generally permitted to determine safety-related workplace standards. For example, under the ADA, an employer may enact a safety-related standard requiring COVID-19 vaccination, if the standard is job-related and consistent with business necessity.  *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, United States Equal Opportunity Employment Commission, at K.6, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws?utm_content=&

---

[10] DIAGNOSIS, Oxford Dictionaries, Oxford University Press, https://premium.Oxforddictionaries.com/definition/english/diagnosis (last visited Dec. 03, 2021).
[11] TREATMENT, Oxford Dictionaries, Oxford University Press, https://premium.oxforddictionaries.com/definition/english/treatment (last visited Dec. 03, 2021).

utm_medium=email&utm_name=&utm_source=govdelivery&utm_term= (last visited Dec. 2, 2021).  If an employee cannot meet such a standard based on a disability, the employer cannot require compliance unless the individual would pose a "direct threat" to the health or safety of others in the workplace.  (*Id.*)  The determination of whether an employee poses such a threat should be based on "reasonable medical judgment that relies on the most current medical knowledge about COVID-19," including, for example, "the level of community spread at the time of the assessment."  (*Id.*)  Additionally, "[s]tatements from the CDC provide an important source of current medical knowledge about COVID-19."  (*Id.*)  Thus, employers, like SRNS, can make safety determinations based on available medical knowledge without themselves making a determination of medical necessity.

5.    Next, Plaintiffs argue that SRNS's denial of employees' requests for medical exemptions constitutes the unauthorized practice of medicine because SRNS is deciding the validity of employees' medical reasons for not taking the vaccine.  Plaintiffs contend that, even if the medical exemptions determinations were made by a licensed physician, such determinations would violate South Carolina's common law prohibition against the corporate practice of medicine.  *See OrthAlliance, Inc. v. McConnell*, No. 8:08-2591-RBH, 2010 WL 1344988, at *4 (D.S.C. March 30, 2010) (citing *Wadsworth v. McRae Drug Co.*, 28 S.E.2d 417, 419 (S.C. 1943) ("It is quite true . . . that a corporation may not engage in the practice of medicine even through licensed employees.")).

6.    South Carolina's common law prohibition on the corporate practice of medicine aims to "preserve to the client the benefit of a highly confidential relationship, based upon personal confidence, ability, and integrity," *OrthAlliance*, 2010 WL 1344988, at *4, which would suffer if the physician or other professional became merely "an agent of a corporation" whose interests are

commercial in nature, *Ezell v. Ritholz*, 198 S.E. 419, 424 (S.C. 1938). *See also* 1977 S.C. Op. Atty. Gen. 298 (1877). However, "[m]any corporations employ physicians to furnish attention to their employees without any thought of profit to the corporation." 1959 WL 10172 (S.C.A.G.) ("Generally the Courts would hold this not to be practicing medicine insofar as the corporation is concerned, although the salaried physician would be held to be practicing medicine and required to meet the medical standards prescribed by law."). Plaintiffs have not made allegations or put forth evidence that SRNS employs physicians or other medical providers to supply services for a profit. At most, Plaintiffs have alleged that SRNS has a medical provider or medical providers to provide services for the company. The court does not interpret the corporate practice of medicine doctrine to prohibit such services.

7.    Plaintiffs also contend that SRNS's employees are making medical decisions in granting or denying medical exemption requests. At the Motions Hearing, Lee Schifer, Director of Safeguards, Security, and Emergency Services at SRNS and Emergency Director for the SRNS Infectious Disease Response Team, testified that medical exemptions have been denied only where the employee's medical provider did not provide sufficient information for the committee to render a determination on whether to grant the request. SRNS also argued that, in making determinations on medical exemption requests, it was not analyzing underlying medical conditions, but determining whether sufficient information was supplied by medical providers and whether accommodations could be given.

8.    The court notes that aside from the allegations in the Second Amended Complaint (ECF No. 26) and the Motion for Preliminary Injunction (ECF No. 14) and the arguments made at the Motions Hearing, Plaintiffs have not submitted *any* evidence showing that they submitted requests for medical exemptions, that such exemptions were denied, or that SRNS's personnel is

administering the vaccine.[12]  Further, even if SRNS was administering the vaccine onsite, through licensed individuals, the Senate Resolution, which Plaintiffs rely on in support of their public policy arguments, undermines the assertion that such conduct is unlawful.  The Resolution provides that "[n]othing contained in this joint resolution shall prevent an employer from encouraging, promoting, or *administering* vaccinations."  S. Res. 177, 124th Gen. Assemb. § 3 (2021).

9.      Due to the extraordinary nature of a preliminary injunction, the court cannot grant such relief unless a plaintiff has met its burden of making a clear showing of likelihood of success on the merits.  Based on the present record, Plaintiffs have not made such a showing regarding their claim that SRNS has engaged in the unauthorized practice of medicine in violation of South Carolina law.

            b.      *Violation of South Carolina Unfair Trade Practices Act*

10.      Plaintiffs contend SRNS's Mandate violates the South Carolina Unfair Trades Practices Act ("SCUTPA") because the language of the Mandate is deceptive and misleading. (ECF No. 14 at 64 ¶ 246.)

11.      South Carolina law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  S.C. Code Ann § 39-5-20(a) (West 2021).  "Unfair trade practices are practices which are 'offensive to public policy or which are immoral, unethical, or oppressive . . . while a deceptive practice is one which has a tendency to deceive.'"  *Bahringer v. ADT Sec. Servs., Inc.*, 942 F. Supp. 2d 585 (D.S.C. 2013).  SCUTPA relief "is not available to redress a private wrong where the public interest is unaffected."  *Upstate*

---

[12] Conversely, SRNS has produced its exemption guidance as well as a summary showing that four (4) Plaintiffs have requested medical exemptions.  (ECF Nos. 27 at 2–3, 27-1.)  Two (2) of the requests were denied, and two (2) were approved on a temporary basis.  (*Id.*)

*Plumbing, Inc. v. AAA Upstate Plumbing of Greenville, LLC*, No. 6:17-cv-521-BHH, 2018 WL 1471908, at *6 (D.S.C. March 26, 2018) (citing *Columbia E. Assocs. v. Bi-Lo, Inc.*, 386 S.E.2d 259, 263 (S.C. Ct. App. 1989)).

12.     In interpreting the SCUTPA, the legislature intended the courts to be "guided by the interpretations given by the Federal Trade Commission and the Federal Courts to § 5(a) (1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."  S.C. Code Ann. § 39-5-20(b).  Under § 45(a) of the Federal Trade Commission Act, "the mere fact that it is to the interest of the community that private rights shall be respected is not enough to support a finding of public interest," rather the public interest "must be specific and substantial."  *Upstate Plumbing*, 2021 WL 1471908, at *6 (citing *F.T.C. v. Klesner*, 280 U.S. 19, 28 (1929)).

13.     Plaintiffs allege the Mandate is "essentially a gratuitous advertisement" and that "Defendant is advertising and pushing these vaccination products, which are in the stream of commerce under an Emergency Use Authorization by the FDA, for its own benefit, to try and persuade and coerce employees into taking them, to achieve its objective of trying to force all of its employees into becoming vaccinated."  (ECF No. 14 at 37 ¶ 147.)

14.     The SCUTPA does not apply to acts that take place in an employer-employee relationship.  *See, e.g.*, *Indus. Packaging Supplies, Inc. v. Davidson*, No. CV 6:18-0651-TMC, 2018 WL 10456201, at *7 (D.S.C. June 22, 2018) ("disputes arising between employers and employees are private matters that fall outside the scope of the SCUTPA" and therefore dismissing Plaintiffs' SCUTPA claim for misappropriation of trade secrets); *Johnson v. Greenville Safety Consultants, Inc.*, No.: 6:17-cv-02334-AMQ, 2018 WL 2462001, at *3 (D.S.C. June 1, 2018) (dismissing SCUTPA claim for intentionally misclassifying employees as independent contractors upon finding that "[e]ven if Plaintiff could establish that his injury impacts the public interest, the

employer-employee relationship does not fall within the intended scope of the [SCUTPA] because employment practices fall within the purview of other statutes adopted for that express purpose.") (citations omitted); *Davenport v. Island Ford, Lincoln, Mercury, Inc.*, 465 S.E.2d 737, 740 (S.C. Ct. App. 1995) (The "employer-employee relationship does not fall within the intended scope of the [SC]UTPA" regardless of at-will status).

15.    Plaintiffs argue that SRNS, as a contractor with the Department of Energy, has a financial interest in maintaining and keeping future contracts with the government. (ECF No. 14 at 38 ¶ 150.) According to Plaintiffs, SRNS has a "financial interest in complying with the Executive Branch of the Federal Government advocating vaccinations and is attempting to push these vaccinations, which have now been released into the stream of commerce." (*Id.*) Regardless of whether the vaccines are in the stream of commerce, however, the declarations requested by Plaintiffs involve rights regarding their employment relationship with SRNS. As such, Plaintiffs' claims do not fall within the scope of the SCUTPA.

16.    Accordingly, Plaintiffs have also failed to make a clear showing that they are likely to be successful on their request for a declaratory judgment finding that the Mandate violates the SCUTPA.

c.    *Violation of South Carolina Public Policy*

17.    Plaintiffs' violation of public policy argument is dispersed throughout the Second Amended Complaint. (ECF No. 26.) Because Plaintiffs do not allege a cause of action for wrongful termination, the court considers this issue within the context of Plaintiffs' claim that the Mandate constitutes an unenforceable contract changing the terms of their employment. (*See* ECF No. 14 at 29–31 ¶¶ 121–29, 42 ¶ 168, 43–44 ¶ 173.)

18.    The public policy of South Carolina is "derived by implication from the established law of the State, as found in its Constitution, statutes, and judicial decisions." *State v. Brown*, 326 S.E.2d 410, 412 (S.C. 1985) (citing *Batchelor v. American Health Ins. Co.*, 107 S.E.2d 36 (S.C. 1959); *Weeks v. New York Life Ins. Co.*, 122 S.E. 586 (S.C. 1924)).

19.    It is well established that South Carolina courts "will not enforce a contract when the subject matter of the contract or an act required for performance violates public policy as expressed in constitutional provisions, statutory law, or judicial decisions." *White v. J.M. Brown Amusement Co.*, 601 S.E.2d 342, 345 (S.C. 2004).

20.    Plaintiffs contend that South Carolina public policy "prohibits private employer Vaccine Mandates and gives South Carolina citizens the right to refuse vaccinations, should they choose, without punishment." (ECF No. 14 at 46 ¶ 183.)

21.    To support their argument, Plaintiffs first cite to South Carolina Code § 44-4-520 (West 2021) and South Carolina Regulation 61-17. (ECF No. 14 at 47–51 ¶ 184–202.)

22.    South Carolina Code § 44-4-520 provides:

(A) During a state of public health emergency, DHEC[13] may exercise the following emergency powers, in addition to its existing powers, over persons as necessary to address the public health emergency:

(1) to vaccinate persons as protection against infectious disease and to prevent the spread of contagious or possibly contagious disease;

(2) to treat persons exposed to or infected with disease; and

(3) to prevent the spread of contagious or possibly contagious disease, DHEC may isolate or quarantine, pursuant to the applicable sections of this act, persons who are unable or unwilling for any reason (including, but not limited to, health, religion, or conscience) to undergo vaccination or treatment pursuant to this section.

---

[13] DHEC is the South Carolina Department of Health and Environmental Control.

(B) Vaccinations or treatment, or both, must be provided only to those individuals
who agree to the vaccinations or treatment, or both.

S.C. Code Ann. § 44-4-520.  Plaintiffs emphasize subsection (B), which provides that vaccination

or treatment be provided only to those individuals who agree to be vaccinated or treated.  (ECF

No. 14 at 48 ¶¶ 191–93.)

23.    South Carolina Regulation 61-17 sets forth standards for licensing nursing homes.

Addressing vaccinations specifically, the regulation requires "direct care volunteers" and "private

sitters" to be vaccinated against annual influenza and hepatitis B "unless the vaccine is medically

contraindicated or the person is offered the vaccination and declined."  Similarly, it requires

nursing home residents to be immunized for Streptococcus pneumoniae "unless the vaccine is

medically contraindicated or the person is offered the vaccination and declined."  *Id*. at 56.

24.    Next, Plaintiffs cite to S.177, a joint resolution passed by the South Carolina Senate

on April 8, 2021, during the most recent legislative session ("Senate Resolution").  (ECF No. 14

at 51–52 ¶¶ 202–05.)  Senate Resolution S. 177 provides that:

No person in this State may be compelled to undergo vaccination to prevent
coronavirus disease 2019, commonly referred to as COVID-19. If a person chooses
not to undergo vaccination, then the person's employer may not subject the person
to an adverse employment action, including, but not limited to, a termination,
suspension, involuntary reassignment, or demotion.

S. Res. 177, 124th Gen. Assemb. (2021).  At this time, the Resolution has been referred to the

South Carolina House of Representatives' Committee on Medical, Military, Public and Municipal

Affairs.  It has not yet passed the House, nor has it been signed by the Governor.  By its own terms,

the Resolution takes effect only upon the Governor's approval.  *Id*.

25.    Finally, Plaintiffs assert that a letter from South Carolina Attorney General Alan

Wilson to President Biden as well as official statements and Twitter posts by South Carolina

Governor Henry McMaster support their position.  (ECF No. 14 at 58–63 ¶ 231–44.)

26.     At the outset, the Supreme Court of South Carolina has recognized that it must "exercise restraint when undertaking the amorphous inquiry of what constitutes public policy." *See Taghivand v. Rite Aid Corp.*, 768 S.E.2d 385, 385 (S.C. 2015).  This is, by nature, a vague and multidimensional question.  Where no statutory or constitutional provisions support the policy at issue, this unelected court has an express duty to exercise "utmost circumspection" before ordaining it as the public policy of this state.  *Id.* (citing *Patton v. United States*, 281 U.S. 276, 306 (1930), *abrogated by Williams v. Florida*, 399 U.S. 78 (1970)).  *Taghivand* expressly rejected the notion that a court can tease "public policy" out from mere principles which "strike to the heart of a citizen's social rights, duties, and responsibilities" but have not been adopted by the legislature of the state.  *Id.* at 388–89.  Instead, the court endorsed a narrower understanding of where public policy may originate:  It found determinations of public policy fall within the exclusive province of the legislature, or, if there is no clear legislative mandate, the Supreme Court of South Carolina.

27.     To demonstrate a likelihood of success on the merits of this claim, therefore, Plaintiffs must point to specific principles of public policy enacted as law by South Carolina's Legislature or Supreme Court.

28.     In this light, statements by officers of the executive branch are not clear mandates of public policy.  *See Amisub of S.C., Inc. v. S.C. Dep't of Health and Env'l Control*, 757 S.E.2d 408, 415 (S.C. 2014); *Hampton v. Haley*, 743 S.E.2d 258, 262 (S.C. 2013).  Letters from South Carolina Attorney General Wilson and social media posts from South Carolina Governor McMaster plainly do not meet Plaintiffs' substantial burden to establish such mandates of public policy.

29.     Turning to Plaintiffs legislative arguments, the court acknowledges that the Senate Resolution squarely addresses vaccine mandates from private employers, and may embody a

public policy supporting individual choice against employer-mandated vaccination requirements. This Senate Resolution, however, has not been enacted into law. And at this point, this Resolution does not represent the "established law of the State, as found in its Constitution, statutes, and judicial decisions." *See Brown*, 326 S.E.2d at 412.

30.     This critical distinction rests on the structure of our state's legislative process and its democratic underpinnings within our Constitution. Any member of the General Assembly, representing the will of her constituents, may introduce and read a bill or joint resolution to create new laws and policies in South Carolina.[14] This sparks a thorough process through which the bill is sent to Committee, debated, negotiated and amended. The process is often lengthy: each body may disagree with amendments pressed by its counterpart, and each bill may go through numerous iterations before it is sent to the bodies for adoption, enrolled for ratification, and finally ratified for the Governor's review. *South Carolina's Legislative Process*, South Carolina Legislature 10 (November 18, 2016, 3:00 PM), https://www.scstatehouse.gov/publicationspage/Booklet_2016_15thedition.pdf. This process safeguards South Carolina's democratic way of life. It advances the will of the majority and protects the minority. It permits debate, encourages compromise, and fosters open discussion such that the final outcome is a measured reflection of the will of the people. Before a bill is enacted, this process is incomplete. It is impossible to discern the bill's final form, and the court cannot place itself into the shoes of the Legislature to do so by speculation. Public policy is the final, definitive statement of law which emerges from the democratic *process* of debate.

---

[14] Members typically work with attorneys within the Legislative Council to put the bill into legal form. *South Carolina's Legislative Process*, South Carolina Legislature 7 (November 18, 2016, 3:00 PM), https://www.scstatehouse.gov/publicationspage/Booklet_2016_15thedition.pdf.

31.     Here, the Senate Resolution has not reached its final form.  It was submitted to the House of Representatives on April 13, 2021, where it currently resides in Committee.  To date, and in the monthlong period before the Legislature adjourned *sine die* on May 13, 2021, the Committee has not taken further action on the bill.  Even if the court could consider unenacted bills as statements of policy, these facts, including the long delay the bill has thus far faced in the House, do not support such a finding in this case.  Of course, the Senate Resolution may ultimately be ratified by the Legislature in its current form.  The court expresses no opinion on its substance.  But at this stage, the court will not, and cannot, read the tea leaves to predict whether the nascent Resolution and its public policy goals will ultimately rise to the rank of established law.  Therefore, the court finds the Senate Resolution does not, in its current form, support Plaintiffs' argument in favor of a statewide public policy against private employer vaccine mandates.

32.     Turning to Plaintiffs' argument under South Carolina Code § 44-4-520 (West 2021), and South Carolina Regulation 61-17, the court again finds that Plaintiffs have not met their burden.  Here, Plaintiffs explain that the statutory provision allows certain vaccine requirements during a state of emergency by DHEC.  Because the state of emergency in South Carolina has ended, the statute authorizes only DHEC to drive emergency vaccination programs.  (ECF No. 14 at 47–48 ¶¶ 187–90.)  Emphasizing subsection (B), which provides that vaccination or treatment be provided only to those individuals who agree to be vaccinated or treated, Plaintiffs argue this statute sets forth a cognizable policy against private employer vaccine mandates.  (*Id*. at 48 ¶¶ 191–93.)

33.     The statute regulates DHEC regarding vaccinations during a public health emergency.  These provisions neither broaden nor narrow the authority of private employers to determine conditions of employment or require necessary safety precautions in the workplace.

Further, as stated previously, Plaintiffs concede they do have a choice of whether to take the vaccine and argue that the choice itself is the harm. Accordingly, the court does not read these statutes to express a clear public policy against employer vaccine mandates.[15]

34.    Even if the court reads South Carolina Code § 44-4-520 and South Carolina Regulation 61-17 to support a public policy favoring individual choice for vaccination, however, the court again concludes Plaintiffs cannot meet their burden. As applied to the facts of this case, this purported policy clashes directly with the well-established and central public policy of at-will employment in South Carolina. To permit the court to invalidate a valid, at-will employment contract between the parties, Plaintiffs must either show a recognized public policy exception to the at-will employment doctrine for vaccine mandates, or demonstrate that where these two public policies conflict, the court should favor the former.

35.    The court notes that South Carolina has long recognized a "strong policy favoring at-will employment." *Taghivand*, 768 S.E.2d at 386. Pursuant to this doctrine, an employment relationship is "generally terminable by either party at any time, for any reason, or for no reason at all." *Prescott v. Farmers Tel. Co-op., Inc.*, 516 S.E.2d 923, 925 (S.C. 1999); *see also Barron v. Lab. Finders of S.C.*, 713 S.E.2d 634, 636 (S.C. 2011) (citing *Mathis v. Brown & Brown of S.C., Inc.*, 698 S.E.2d 773, 778 (S.C. 2010)). The Supreme Court of South Carolina has specifically endorsed this doctrine as an "incentive to economic development" which creates a flexible and dynamic marketplace within the state. *Prescott*, 516 S.E.2d at 925. State and federal courts have continually affirmed the doctrine as a central element of South Carolina's employment

---

[15] In fact, the court notes that South Carolina law conditions school and childcare attendance on being immunized unless a medical or religious exemption applies. S.C. Code Ann. § 44-29-180 (West 2021); S.C. Code Ann. Regs. 61-8 (West 2021).

jurisprudence.  *See, e.g.*, *Thompson v. Richland Cty. Sch. Dist. One*, No. 3:17-cv-00510-DCC, 2018 WL 2676159, at *5 (D.S.C. June 5, 2018).

36.    The importance of this doctrine and the weighty policy interest it serves, therefore, cannot seriously be questioned by the parties.

37.    No policy is without exception, of course, and the Supreme Court of South Carolina has departed from the doctrine in several specific instances.  In *Ludwick v. This Minute of Carolina, Inc.*, 337 S.E.2d 213, 225 (S.C. 1985), the court reiterated that while "[t]he doctrine of termination at will remains the law of this state," an employer may not require an employee to violate criminal laws in order to remain employed.  The court determined that this impermissible requirement in itself constituted a violation of the public policy of the state, as expressed in its penal code.  A second exception has been recognized where the "termination itself is a violation of criminal law," or whenever "there is a retaliatory termination of the at-will employee in violation of a clear mandate of public policy."  *Barron*, 713 S.E.2d at 637–38.  The Supreme Court of South Carolina previously declined the invitation to "broaden the exception to the at-will employment doctrine" and indicated that it would require a "more clear and articulable definition of policy from the General Assembly" before enacting a new, judicially constructed exception.  *Taghivand*, 768 S.E.2d at 389; *see also Dockins v. Ingles Markets, Inc.*, 413 S.E.2d 18, 18 (S.C. 1992) ("[The *Ludowick*] public policy exception to the termination of at-will employees has not been extended beyond situations where the termination is in retaliation for an employee's refusal to violate the law at the direction of his employer.  We decline to expand this exception to the case at bar.") (internal marks and citations omitted).

38.    This court too declines to create a new exception to the at-will employment doctrine here.  Plaintiffs have not shown that a public policy inferred from statutory grants of authority to

DHEC or state nursing home regulations is strong enough to overcome the well-established doctrine of at-will employment. The scope of the statute and regulation at issue is narrow and is unrelated to employment. It is not clear how a narrowly articulated policy intended to regulate a state agency can eviscerate the doctrine of at-will employment. At any rate, basic principles of comity and federalism counsel against this federal court's interference with state policy by comparing and weighing conflicting policies on facially unrelated issues. Even South Carolina's courts have hesitated to "consider and balance competing interests and policies" embodied in a particular area of law, because "it is not the province of the courts to perform legislative functions." *Holman v. Bulldog Trucking Co.*, 428 S.E.2d 889, 893 (S.C. Ct. App. 1993). The United States Court of Appeals for the Fourth Circuit has also cautioned courts against broadening public policy: "Courts must use care in creating new public policy. . . . [D]eclaration of public policy is normally the function of the legislative branch . . . unless deducible in the given circumstances from constitutional or statutory provisions, [public policy] should be accepted as a basis of a judicial determination, if at all, only with the utmost circumspection." *Adler v. Am. Standard Corp.*, 830 F.2d 1303, 1306–07 (4th Cir. 1987); *see also Herrmann v. Tri Star Freight Sys.*, No. 2:07-cv-3316-PMD, 2008 WL 11464715, at *3 (D.S.C. Mar. 25, 2008).

39.    The court must follow this guidance here. In the absence of a clear legislative statement which strikes a balance between these competing policies, this court cannot invalidate a valid at-will employment contract on policy grounds alone.

40.    The court finds Plaintiffs have failed to make a clear showing that they are likely to be successful on their request for a declaratory judgment that the Mandate violates South Carolina public policy.

d.    "*Violation of Federal Law & Policy*[16]

41.    Plaintiffs argue the Mandate violates the legal standards set forth at 21 U.S.C. § 360bbb-3(e)(1)(A)(ii) regarding conditions of use for medical products in emergencies. This section requires the HHS Secretary to establish certain conditions on EUA products including:

> (ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—
>
> > (I) that the Secretary has authorized the emergency use of the product;
> > (II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
> > (III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A)(ii).

42.    As an initial matter, the FDA has now given its full approval – not just emergency use authorization – to the Pfizer vaccine as administered to individuals sixteen (16) years of age and older. *See FDA News Release*, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/comirnatyand-pfizer-biontech-covid-19-vaccine (last visited Nov. 24, 2021).

43.    The statutory provisions cited by Plaintiffs do not prevent private employers like SRNS from requiring employees to be vaccinated against COVID-19. Instead, the statute requires that, for medical products under an EUA, "HHS must establish conditions to facilitate informed consent." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii); *see also Valdez v. Grisham*, No. 21-cv-783-MV-JHR, 2021 WL 4145746, at *4 (D.N.M. Sept. 13, 2021) (citing *Klaassen v. Trustees of Indiana Univ. ("Klaassen I")*, No. 21-cv-238, 2021 WL 3073926, at *25 (N.D. Ind. July 18, 2021), *aff'd*,

---

[16] At the Motions Hearing, Plaintiffs' counsel conceded that Plaintiffs are not attempting to bring an injunction under the FDCA, but that this section is relevant to show that the Mandate violates the public policy of the United States because it does not comply with the informed consent requirements of this statute.

34

7 F.4th 592 (7th Cir. 2021)).  This informed consent requirement "only applies to medical providers." *Valdez*, 2021 WL 4145746, at *4 (citing *Klaassen I*, 2021 WL 3073926, at *25).

44.    As such, to the extent the vaccines at issue are subject to the EUA provisions of the FDCA, the Mandate does not violate those provisions.  *See Valdez*, 2021 WL 4145746, at *4; *Bridges v. Hous. Methodist Church*, No. H-21-1774, 2021 WL 2399994, at *2 (S.D. Tex. June 12, 2021) (finding that federal law "confers certain powers and responsibilities to the Secretary of Health and Human Services in an emergency[,]" but that "[i]t neither expands nor restricts the responsibilities of private employers; [and] in fact, it does not apply at all to private employers[,]" nor does it "confer a private opportunity to sue the government, employer, or worker.");  Dep't of Justice, *Whether Section 564 of the Food, Drug and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization* at 18 (July 6, 2021), https://www.justice.gov/olc/file/1415446/download (concluding that the FDCA provisions "do[] not prohibit public or private entities from imposing vaccination requirements, even when the only vaccines available are those authorized under EUAs.").

45.    Here, even assuming SRNS is required to provide informed consent under federal law for the Pfizer vaccine offered onsite, Plaintiffs have not alleged the relevant information is not being provided to individuals vaccinated by the medical providers onsite.  Plaintiffs focus on the language provided in the three-page Mandate providing that "Johnson & Johnson and Moderna vaccines are not currently offered on-site but are accepted as vaccinations approved by the CDC." (ECF No. 14-1 at 2.)  More specifically, Plaintiffs focus on the information not provided in the Mandate: the required informed consent language provided in the FDCA.  The language of the statute, however, requires the information to be provided to "individuals to whom the product is administered."  21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I).  Nothing in the Mandate implies it is the

final source of information on the vaccine and none of Plaintiffs have been administered the vaccine, therefore, there is no requirement that they be provided further information.

46.    Accordingly, Plaintiffs have not made a clear showing they are likely to be successful on their claim that SRNS has violated the FDCA or federal public policy.

**B.    <u>Irreparable Harm</u>**

47.    Plaintiffs must also show they are likely to suffer irreparable harm absent the preliminary injunction. *Winter*, 555 U.S. at 22–23. To demonstrate a need for injunctive relief, a plaintiff must show how the harm suffered is such that other forms of damages available in the normal course of litigation are not enough. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough," because of the "the possibility that adequate compensatory or other corrective relief will be available at a later date." *Hughes Network Sys.*, 17 F.3d at 694. The possibility of other relief "weighs heavily against a claim of irreparable harm." *Id.*

48.    Accordingly, "[w]hen analyzing the irreparable harm element, there are two inquiries: (1) whether the plaintiff is indeed suffering actual and imminent harm; and (2) whether that harm is truly irreparable, or whether it can be remedied at a later time with money damages." *Sauer-Danfoss Co.*, 2012 WL 6042831, at *1 (quoting *First Quality Tissue SE, LLC*, 2011 WL 6122639, at *2).

49.    Plaintiffs allege that the irreparable harm is not the loss of their employment, but the loss of liberty in being forced to choose between their employment and taking a vaccine they believe to be dangerous. Other courts considering the choice as an irreparable harm argument have determined that such a choice "does not constitute irreparable harm that warrants enjoining a vaccine mandate." *Plata v. Newsom*, No. 01-cv-01351-JST, 2021 WL 5410608, at *3 (N.D. Cal.

36

Nov. 17, 2021); *see also Bauer v. Summey*, No. 2:21-CV-02952-DCN, 2021 WL 4900922, at *18 (D.S.C. Oct. 21, 2021); *Valdez*, 2021 WL 4145746, at *12; *Norris v. Stanley*, No. 1:21-cv-756, 2021 WL 3891615, at *3 (W.D. Mich. Aug. 31, 2021).

50.     Contrary to Plaintiffs' claim, failure to abide by SRNS's Mandate does not mean that they will be forcibly vaccinated. *See Beckerich v. St. Elizabeth Med. Ctr.*, No. 21-105-DLB-EBA, 2021 WL 4390827, at *7 (E.D. Ky. Sept. 24, 2021) ("[N]o Plaintiff in this case is being forcibly vaccinated. . .. Rather, these Plaintiffs are choosing whether to comply with a condition of employment, or to deal with the potential consequences of that choice. Even if they believe the condition or the consequences are wrong, the law affords them an avenue of recourse - and that avenue is not injunctive relief on this record.").

51.     Additionally, the options alleged by Plaintiffs are not their only choices under the Mandate. The Mandate provides that Plaintiffs can take the vaccine of their choosing, apply for a religious or medical exemption, remain unvaccinated and take unpaid leave, remain unvaccinated and resign, or remain unvaccinated and be "subject to termination." (ECF No. 14-1 at 2.) The fact remains that Plaintiffs have a choice, even if it is a choice they consider "unacceptable and untenable," and the choice provides more options than loss of employment or vaccination. (ECF No. 14 at 24–25 ¶ 102.)

52.     Further, if Plaintiffs choose to remain unvaccinated and they are ultimately terminated, "loss of employment is not considered to be an irreparable injury because it is fully compensable by monetary damages." *Bauer v. Summey*, 2021 WL 4900922, at *18 (citing *Seery v. DePuy Orthopaedics, Inc.*, 2014 WL 12609705, at *1 (D.S.C. Dec. 23, 2014) (finding that loss of income payments "are easily calculated and compensated; they are not irreparable"); *Hayes v. City of Memphis*, 73 F. App'x 140, 141 (6th Cir. 2003)). Because loss of employment is not

irreparable, a preliminary injunction on that basis is not appropriate. *See Jane Doe 1 v. Northshore Univ. Healthsystem*, No. 21-cv-05683, 2021 WL 5578790, at *8 (N.D. Ill. Nov. 30, 2021).

53.     In finding that Plaintiffs have not shown irreparable harm, the court is not determining that Plaintiffs will not experience any harm.  The court is mindful of Plaintiffs' concerns about taking the COVID-19 vaccine and understands the economic harm caused by loss of employment.  The court is also mindful, however, of the extraordinary nature of the preliminary injunction remedy and cannot legally enjoin private parties if the burden for such a remedy has not been met.  *See MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).  In this case, Plaintiffs have not met their burden of showing they will experience irreparable harm in the absence of injunctive relief.

## C.     **Balance of Equities and Public Interest Factors**

54.     Generally, in determining whether to grant a motion for injunctive relief, "[t]he court must also consider the balance of hardships between the litigants and the impact on the public at large prior to issuing an injunction."  *Uhlig*, 2012 WL 2458062, at *4.

55.     However, Plaintiffs have not made a clear showing that they will likely succeed on the merits or that they will suffer irreparable harm.  Therefore, this court need not address the other necessary elements for preliminary injunctive relief.  *See, e.g.*, *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 225 (5th Cir. 2010) ("Because we have determined that Plaintiffs cannot show a substantial likelihood of success on the merits, we need not address FEMA's additional arguments regarding the other necessary elements for preliminary injunctive relief. The holding on the initial element is sufficient to vacate the injunction."); *Coleman v. Chase Bank*, No. 3:14-cv-101, 2014 WL 2533400, at *3 (E.D. Va. June 5, 2014) ("Because Plaintiffs

cannot show a likelihood of success on the merits, the Court need not address the remaining factors.").

56.    Overall, a preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001); *McKeown v. Pacheko*, 2011 WL 1335199, at *1 (D.S.C. Mar. 21, 2011), *report and recommendation adopted sub nom. McKeowen v. Pacheko*, 2011 WL 1321975 (D.S.C. Apr. 7, 2011).    The party seeking the preliminary injunction bears the burden of proving, by a preponderance of the evidence, all four (4) elements of the preliminary injunction determination.    *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 591 (E.D. Va. 2008); *Planned Parenthood S. Atl. v. Wilson*, No. 3:21-cv000508-MGL, 2021 WL 1060123, at *2 (D.S.C. Mar. 19, 2021).

57.    Because Plaintiffs have not met this burden, the court cannot grant Plaintiffs' Motion for Preliminary Injunction (ECF No. 14).

## VI.    CONCLUSION

For the foregoing reasons and after careful consideration of the record, the court **DENIES** Plaintiffs' Motion for Preliminary Injunction and Restraining Order.  (ECF No. 14.)

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

December 3, 2021
Columbia, South Carolina